IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERT PIERRE KIDD,

                Plaintiff,

  v.                                                                   OPINION and ORDER

JOEL SANKEY, MATTHEW HUELSMAN,                                18-cv-831-jdp
and JESSIE SCHNEIDER,

                Defendants.

---

Plaintiff Robert Pierre Kidd, appearing pro se, is a prisoner at Waupun Correctional Institution. Kidd alleges that defendant prison officials handcuffed him, held him down, and pepper sprayed him to subdue him while he was having a seizure, even though medical staff had told prison officials not to handcuff him during seizures. I granted Kidd leave to proceed on Eighth Amendment claims that officers failed to provide him with proper care for his medical problem and that they used excessive force against him.

Defendants have filed a motion for summary judgment, Dkt. 124, which I will grant in its entirety because defendants were not barred from handcuffing Kidd, they were told by a nurse that Kidd was not having a seizure, and their efforts in restraining him were reasonable given his assault of the nurse and his continued resistance.

UNDISPUTED FACTS

Kidd's opposition materials do not comply with this court's procedures to be followed on summary judgment. Kidd initially filed a brief that doubled as a declaration because it was sworn under penalty of perjury, along with attached evidentiary documents. Dkt. 139. Kidd did not provide a separate document containing numbered responses to each of defendants'

proposed findings of fact, nor did he submit a document containing his own numbered proposed findings of fact. I gave Kidd another chance to file opposition materials complying with the court's procedures. Dkt. 140, at 2. In response, Kidd filed an identical brief/declaration and attached a larger number of documents, but he again did not file numbered responses to each of defendants' proposed findings of fact or his own numbered proposed findings of fact. Dkt. 141.

Because of Kidd's failure to comply with this court's rules, defendants ask me to accept all of their proposed findings of fact as undisputed and grant summary judgment in their favor. But I will give Kidd some leeway as a pro se litigant. Because Kidd's declaration presents facts regarding his own version of events that clearly dispute some of defendants' proposed findings, I will consider those facts in ruling on the summary judgment motion.

The following facts are undisputed except where noted.

Plaintiff Robert Pierre Kidd is incarcerated at Waupun Correctional Institution. During the times relevant to this lawsuit, defendants Joel Sankey and Matthew Huelsman were correctional sergeants. Defendant Jessie Schneider was a lieutenant.

Kidd says that he suffers from seizures. This case involves a December 2, 2014 incident in which defendants restrained Kidd while he says that he was having a seizure. At the time of this incident, Kidd was being treated under a "Seizure Disorder Treatment Care Plan." Dkt. 136-4. That document shows that Kidd was diagnosed with "pseudoseizure" as well as another handwritten diagnosis that is only partially legible and that neither side clarifies; it appears to read in part "myoclonic epilepsy." *Id.* A pseudoseizure is a "non-epileptic seizure that occurs when a person exhibits seizure-like behavior that has no corresponding neurological component." Dkt. 132, ¶ 14. The plan also shows that Kidd was being treated with medication,

but the handwriting stating his prescriptions at the time of the incident is too difficult to make out and the parties to not explain what it says. *Id.*

At about 11:25 a.m. Kidd was at the prison's Health Services Unit waiting to be transferred for outside medical treatment for his reports of stomach pain. Sergeant Michael Malm (who is not a defendant) saw Kidd try to stand up from the chair he was sitting in. Kidd's right arm was shaking. Malm tried to talk to Kidd but got no response. Kidd started to fall over. Malm went over to Kidd and put a hand on his shoulder to help him back into the chair. Malm felt Kidd "actively increasing the amount of force leaning forward" so that Kidd would fall out of the chair. Dkt. 135-1, at 2. Malm asked defendant Sergeant Huelsman to get a nurse; Huelsman went to the HSU office and got Nurse Clinician Kristine DeYoung (who is not a defendant) to help them.

Kidd continued to push forward out of the chair, and he grabbed at Nurse DeYoung's leg. DeYoung noticed that Kidd was able to make and maintain eye contact with her and Malm. Malm asked DeYoung if they should help Kidd down to the floor instead of letting him fall. Malm, DeYoung, and Huelsman helped Kidd to the floor, and Kidd appeared to calm down.

Malm left to write a report of the incident. Huelsman stayed in the room and DeYoung stayed on the floor by Kidd's legs. A few minutes later, Kidd tried to stand up. DeYoung told him to stay on the ground. Kidd kept trying to stand up and he grabbed DeYoung's hair. Around this time, defendant Sergeant Sankey arrived in the room. Huelsman told Sankey that they would handcuff Kidd. Huelsman told Kidd to stay on the floor and turn on his stomach, but Kidd refused. Huelsman and Sankey turned Kidd onto his stomach and ordered Kidd to put his hands behind his back; Kidd continued to resist and pull his arms into his chest, away

3

from the officers trying to restrain him. The officers were unable to handcuff Kidd. Malm secured Kidd's legs, and Malm radioed for a supervisor to report to the scene.

While this was happening, Kidd yelled that he was having a seizure. Nurse DeYoung believed that Kidd was not having a seizure. Based on her medical training and her experience with patients, DeYoung states that patients having a seizure typically will exhibit some of the following symptoms: falling, losing consciousness, uncontrollable muscle spasms, drooling or frothing at the mouth, sudden and rapid eye movements, clenched teeth, and the inability to respond to commands. Indicators that an individual is not having a seizure include the person remaining conscious, being able to make eye contact, responding to verbal instructions, and making volitional movements. Because Kidd remained conscious, appeared to have control over his bodily movements, did not have muscle spasms, was able to maintain eye contact, and responded—albeit negatively—to staffers' commands, DeYoung told the officers that Kidd was not experiencing a seizure.

Huelsman warned Kidd at least twice that he would use pepper spray to gain Kidd's compliance if he continued to resist officers' efforts to handcuff him. After Kidd continued to resist their attempts to handcuff him, Huelsman yelled "spray, spray, spray" and then directed a one-second burst of pepper spray at Kidd's face. Kidd continued to resist and grab at officers. More officers, including defendant Lieutenant Schneider, arrived at the scene. Schneider told Kidd that he had a Taser and that he would use it if Kidd continued to resist officers. Officers were then able to handcuff Kidd. Schneider decided to place Kidd in "control" status and he was escorted to the segregation unit.[1]

---

[1] The prison incident reports submitted by defendants detail additional uses of force against Kidd during and after his escort to segregation, including tackling him to the floor and using a Taser on him. *See* Dkt. 134-1, at 2. But those events are not part of Kidd's claims in this lawsuit

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

In his complaint, Kidd alleged that defendants Sankey, Huelsman, and Schneider responded to his seizure by handcuffing him, holding him down, and pepper spraying him despite instructions from medical staff not to handcuff him while he is having a seizure. I granted Kidd leave to proceed Eighth Amendment claims under two theories: (1) defendants acted with conscious disregard to his serious medical needs; and (2) they used excessive force against him.

A. **Eighth Amendment medical care claims**

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a

---

so I will not discuss them further.

substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Defendants contend that Kidd did not actually have a seizure during the incident at issue. They say that Kidd "claims" to suffer from seizures, Dkt. 125, at 12, by which I take to mean that they dispute whether Kidd truly suffers from a seizure disorder. They briefly discuss his diagnosis of pseudoseizures, which are episodes resembling seizures that do not have a corresponding neurological component, but they don't produce evidence showing that a pseudoseizure diagnosis means that a person is faking seizures. And in any event, Kidd says that he suffers seizures, he produces a Department of Veterans Affairs document stating that he is disabled from a seizure disorder, Dkt. 139-1, at 3, and his medical records show that he received treatment for pseudoseizures and for an additional diagnosis that appears to be epilepsy. So a jury could reasonably infer that Kidd indeed suffers from a seizure disorder.

Defendants argue that even if Kidd generally suffers from a seizure disorder, he was faking a seizure during the incident at issue. In her declaration, DeYoung says that Kidd has an established history of feigning seizure-like symptoms in order to excuse noncompliant behavior. And she says that Kidd wasn't experiencing symptoms associated with a seizure; she says that Kidd was responsive, able to maintain eye contact, actively resisted the officers' attempt to control his limbs, and did not appear to be suffering from muscle spasms. I'll accept DeYoung's testimony about her knowledge of seizure symptoms and her firsthand account of the incident at issue. But I will not accept her testimony that Kidd has a history of feigning

seizures because defendants do not point to any specific evidence providing the foundation for DeYoung's conclusory statement.

Kidd says that he was indeed having a seizure, as shown by him shaking and falling out of his chair. He does not explicitly dispute DeYoung's assessments about his symptoms or lack thereof, other than to note that the incident reports make clear that he was not verbally responsive to commands—at least in the sense that he did not follow any of those commands. Rather, he says that there is a gap in his memory: he remembers sitting in the HSU and the next thing he remembers is sitting in segregation with his eyes in pain from the pepper spray. I take him to be saying that he blacked out during his seizure. Kidd argues that DeYoung is lying when she says that she didn't believe that he was having a seizure because she stayed by his side after he was initially subdued on the floor. Kidd argues that she would not have stayed with him unless she thought he was having a medical problem.

The problem for Kidd is that ultimately this case doesn't hinge on whether he was actually having a seizure, or whether DeYoung lied when she told the defendant officers that Kidd wasn't having a seizure. Kidd's claims are against the officers who acted to restrain him. The thrust of Kidd's allegations was that defendants responded to his seizure by using force rather than seeking medical treatment for him, even though they had been instructed by medical staff not to handcuff him during a seizure. But the undisputed facts show that defendants did not act counter to medical advice: DeYoung told the officers that Kidd was not having a seizure, and defendants produce a "Medical Restriction/Special Needs" form showing that a handcuffing restriction wasn't entered until September 2015, months after the incident at issue here. Dkt. 136-2. Because defendants were entitled to rely on Nurse DeYoung's professional assessment of Kidd's medical condition, and because there was no restriction on

7

the use of restraints at the time of the incident, no reasonable jury could conclude that defendants disregarded Kidd's medical needs by restraining him. *See, e.g.*, *Est. of Perry v. Wenzel*, 872 F.3d 439, 458 (7th Cir. 2017) ("These officers were not medical professionals. Therefore, they were entitled to rely upon the nurses' professional judgment without subjecting themselves to § 1983 liability."); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel."). I will grant summary judgment to defendants on this set of Eighth Amendment claims.

### B. Eighth Amendment excessive force claims

My dismissal of the medical care claims does not resolve Kidd's excessive force claims. The Eighth Amendment prohibits prison staff from using excessive force against an inmate regardless whether the inmate presents a medical concern like seizures.

To prevail on an Eighth Amendment excessive force claim, a prisoner must prove that the offending officer applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (*quoting Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The factors relevant to this determination include: (1) why force was needed; (2) how much force was used; (3) the extent of the injury inflicted; (4) whether the defendant perceived a threat to the safety of staff and prisoners; and (5) whether efforts were made to temper the severity of the force. *Whitley*, 475 U.S. at 321.

Excessive force claims are often not amenable to resolution at summary judgment because there are genuine issues of disputed material fact about precisely what actions prison officials took to subdue a prisoner. But here, there is no material dispute about what happened, and defendants acted reasonably given the circumstances.

After Malm, DeYoung, and defendant Huelsman initially helped Kidd to the floor and he had calmed down, Kidd tried to get back up despite DeYoung's instructions not to, and he grabbed DeYoung's hair. Huelsman and Sankey did not violate the Eighth Amendment by attempting to physically restrain Kidd to end the threat of harm to DeYoung. *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) (prison officials "must be able to handle, sometimes manhandle" inmates to maintain order in the prison environment).

Kidd continued to struggle with Huelsman and Sankey, keeping them from handcuffing him. This led Huelsman to threaten Kidd with pepper spray and then to use it after Kidd continued to resist their efforts to handcuff him. Under the Eighth Amendment, pepper spray may be used in limited quantities when reasonably necessary to subdue or maintain control over an inmate. *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The use of the substance (tear gas) in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning . . . ." (internal quotations omitted)). That's what happened here: Huelsman warned Kidd at least twice that he would use pepper spray and Kidd continued to resist being handcuffed. Huelsman then used a short one-second burst of spray. And by this point Huelsman had already been advised by DeYoung that Kidd was not having a seizure. Huelsman was entitled to treat Kidd as a recalcitrant prisoner who had assaulted a nurse; his use of pepper spray did not violate the Eighth Amendment.

Defendant Schnieder's involvement in the events pertaining to Kidd's claims is limited to threatening him with a Taser after even the use of pepper spray did not result in Kidd's compliance with being handcuffed. Given Kidd's continued resistance, this mere threat of additional force was not excessive either.

9

Overall, defendants' response to Kidd's behavior appeared to be no more than necessary to get him to cooperate with their attempts to restrain him after he assaulted Nurse DeYoung; it certainly was not malicious or sadistic. Therefore, I will grant defendants' motion for summary judgment on Kidd's excessive force claims.[2] Because I will grant summary judgment to defendants on all of Kidd's claims, the entire case will be dismissed. Defendants have filed a motion to stay the trial submissions deadline and trial date. Dkt. 145. That motion will be denied as moot given my dismissal of all of Kidd's claims.

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 124, is GRANTED.

2. Defendants' motion to stay proceedings, Dkt. 145, is DENIED as moot.

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered November 15, 2021.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge

---

[2] Defendants also contend that they are entitled to qualified immunity on Kidd's claims. Because I am dismissing Kidd's claims on the merits, I need not consider defendants' qualified immunity arguments.